1  MELINDA HAAG (CSBN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Acting Criminal Chief

4  RICHARD C. CHENG (CSBN 135992)
   Assistant United States Attorney
5
      150 Almaden Boulevard, 9th Floor
6     San Jose, California 95113
      Telephone: (408) 535-5032
7     FAX: (408) 535-5032
      e-mail: richard.cheng@usdoj.gov
8
   Attorneys for Plaintiff
9

10           UNITED STATES DISTRICT COURT

11         NORTHERN DISTRICT OF CALIFORNIA

12              SAN JOSE DIVISION

13              (Judge James Ware)

14
   UNITED STATES OF AMERICA,        )    No. CR 09-00670-JW/HRL
15                                   )
          Plaintiff,                 )    GOVERNMENT'S OPPOSITION TO
16                                   )    DEFENDANT'S MOTION FOR
       v.                            )    DISCOVERY:
17                                   )
   DAVID FOLEY,                      )
18                                   )    Date: October 28, 2010
          Defendant.                 )    Time: 1:30 p.m
19                                   )    Court: Magistrate Howard R. Lloyd
                                     )
20  _____ )

21

22        COMES NOW, the plaintiff, UNITED STATES OF AMERICA, by and through its

23  counsel, Melinda Haag , United States Attorney, and Richard C. Cheng, Assistant United States

24  Attorney, and hereby files its response and opposition to defendant's motions for discovery.

25                              **I**

26                   **STATEMENT OF FACTS**

27  Introduction

28        While employed as the CTO of Global VR, Inc., David Foley executed a scheme to mass

produce illegal copies of Global VR's newest, proprietary games and technology, as well as unauthorized arcade systems, for sale to Michael Daddona and Daddona's company, Automated Services.  The illegal products Foley made and sold also included games that neither Foley nor Global VR ever had a license to produce or sell (such as Pac Man and Frogger, and other computer games owned by third parties), but which Foley configured to run on Global VR''s proprietary UltraCade multi-game platform.  Daddona has already admitted and provided evidence that he paid Foley over $340,000, both before and after Mr. Foley became an employee of Global VR.  Moreover, Foley has testified in a civil deposition that he pocketed these proceeds from these sales to Daddona into his personal and private bank accounts.  Meanwhile, emails collected vividly depict Foley's knowing and intentional efforts to avoid detection, and his willingness to give Daddona whatever Global VR products Daddona wanted, in exchange for money to maintain a lavish multi-million dollar home and luxury cars.

<u>Background</u>

In the early fall of 2005, Global VR identified NexTune Corporation, doing business as UltraCade Technologies ("UltraCade"), as a potential acquisition to boost Global VR's business.  UltraCade had been founded by David Foley, who was UltraCade's sole shareholder and served as UltraCade's president.  UltraCade had either developed or purported to own the rights to many classic, sought-after arcade titles and products which Global VR was interested in developing and porting to the coin-operated gaming, home arcade game and casino gaming markets.  In addition to the titles and products held by UltraCade, David Foley personally purported to hold ownership rights to certain games he claimed to have developed himself.

Global VR's executive team, led by its then CEO and President, James DeRose, Jr., entered into negotiations to evaluate a possible merger with the acquisition of the assets of both UltraCade and of David Foley.  UltraCade and Global VR signed a Memorandum of Understanding ("MOU") memorializing the parties' intentions on December 8, 2005.  During its due diligence of this transaction, Global VR discovered that UltraCade was in financial extremis, including $700,000 in unpaid payroll taxes. Given UltraCade's insolvency, GlobalVR reported that the best course for its acquisition UltraCade was through assignment for the benefit of

creditors. A third party, Sherwood Partners, LLC, took assignment of all of the assets of UltraCade.  In turn, Sherwood then sold the majority of the assets to Global VR for cash, and was then to liquidate the remaining UltraCade assets to make payments to UltraCade's creditors, and generally wind up the company's affairs.  As part of the overall transaction, Global VR also entered into a separate agreement with David Foley, individually, to purchase his intellectual property rights.

On June 2, 2006, UltraCade, David Foley, Global VR, and Sherwood Partners, as Assignee for the Benefit of Creditors, finalized an assignment in an overarching Asset Purchase Transaction that was a complete transfer of all of UltraCade and David Foley's ownership interests in the subject technology and assets.  Through it, Global VR acquired all ownership rights to the assets. Foley confirmed this not only in the Asset Purchase Transaction, but also in a personal representation letter.

As part of the Asset Purchase Transaction, on June 2, 2006, Foley became Global VR's Chief Technology Officer and Executive Vice President of Gaming. Foley executed an Employment Agreement and Employee Invention Assignment and Confidentiality Agreement. David Foley was obligated under his Employment and Confidentiality agreements, as well as the duties of confidentiality and loyalty to his employer, to maintain proprietary and/or confidential information in confidence and to act in Global VR's best interests.  As CTO, Foley was exposed to and entrusted with Global VR's proprietary and/or confidential information relating to Global VR's product development, source code, business strategy, and customer information.  This exposure included, without limitation, access to Global VR's proprietary and confidential information.

<u>Trafficking in Counterfeit/Stolen Goods</u>

According to Brian Matthews, former Executive Vice President of UltraCade, at some time prior to the sale of the company to GlobalVR, Foley asked the engineering department at UltraCade for a fob burner that he could use for testing purposes.  A fob burner is used to program video games onto key fobs.  That piece of hardware is critical for ensuring the security of Global VR's intellectual property because it contains the proprietary encryption codes and

1  delivery mechanism.  The encryption codes and delivery mechanism must be loaded onto a game

2  pack in order to ensure the game pack functions in a Global VR arcade machine. A total of three

3  fob burners were created at UltraCade. First, the production crew responsible for manufacturing

4  game packs possessed a fob burner in their wok area. Second, the software engineer responsible

5  for testing the game packs possessed a fob burner in his work area.  Matthews saw the third fob

6  burner in Foley's office shortly thereafter, but it disappeared within a few weeks.  Fred Abadi,

7  Director of Manufacturing for Global VR, stated that at sometime between February and June of

8  2006, during a casual visit to Foley's residence at 311 Santa Rosa Drive, Los Gatos, California,

9  Abadi noticed a fob burner and several boxes of key fobs.

10      Automated Services, a company in Milford, Connecticut, owned and operated by Michael

11  Daddona, was in the business of selling video gaming products for the home market, and did

12  purchase items from Global VR, ranging from game packs to the actual arcade cabinets which

13  house the screen and the video game console. The table below represents the number of

14  legitimately bought and properly licensed product Daddona bought from Global VR itself.

15

16

| Date | Product | Number of Units Shipped/Price per Unit | Subtotal Price |
|------|---------|----------------------------------------|----------------|
| **August 23, 2006** | Taito Game Pack | 10/$399 | $3,990 |
| **August 23, 2006** | Space Invaders Game Pack | 10/$299 | $2,990 |
| **November 10, 2006** | Space Invaders Game Pack | 10/$149 | $1,490 |
| **November 13, 2006** | Ultrapin 32" LCD Cabinet | 1/$4,995 | $4,995 |
| **December 1, 2006** | Space Invaders Game Pack | 10/$149 | $1,490 |
| **December 18, 2006** | Ultrapin 32" LCD Cabinet | 10/$4,200 | $42,000 |
| **March 30, 2007** | 25" Global Arcade Classics | 4/$2,295 | $9,180 |
| **April 13, 2007** | 25" Global Arcade Classics | 3/$2,295 | $6,885 |
| **July 3, 2007** | Ultrapin 25" LCD Cabinet | 5/$3,995 | $19,975 |

25  Subtotal Price + Shipping and Handling Charges = TOTAL COST = $93,093.66

26      However, by the end of the summer in 2006, Kenneth Bayer, Executive Vice President of

27  Operations, noticed that Global VR was not selling much of the UltraCade product line to

28  Daddona or any other of their regular customers.  After examining the sales record of UltraCade

Government's Opposition To Compel Discovery

before and after Global VR's acquisition of UltraCade, Bayer determined that the sales were far lower after the acquisition. Specifically, in September 2006 Global VR discovered that Automated Services, previously UltraCade's largest purchaser of products, had ordered virtually no game packs from Global VR in 2006.  Yet, Daddona was also reporting to Global VR sales persons that Automated already had an excess inventory of game packs on hand, despite not having ordered any from Global VR.  Automated's possession of such a large inventory of fobs was inexplicable when neither UltraCade nor Global VR's records suggested that these fobs had come through official channels.  In fact, Elaine Shirley, Vice President of Domestic Sales, told Bayer that a tremendous amount of business appeared to be happening in the market for UltraCade products, but it did not appear that it was coming from Global VR.  Moreover, Automated was also advertising through the internet sales at well below the cost of the retail value Global VR would have sold to Automated.

Global VR conducted an internal audit of game pack sales, by collecting purchase and order invoices from parts supplier MA Labs. The audit revealed 1100 missing blank fobs that had been ordered and paid for by UltraCade, but they were never accounted for in inventory. These 1100 fobs consisted of a December 2005 order of 900 fobs, as well as another 200 fobs ordered and shipped to Foley's personal residence in January 2006. The value of the 1100 unaccounted for fobs, once loaded and sold by Foley, was hundreds of thousands of dollars of revenue (as the value of game packs once loaded on fobs runs from $200 to $400 per fob).  MA Labs also provided Global VR with an invoice dated July 20, 2006, which was well after the Asset Purchase Transaction closed and after Foley had begun his employment at Global VR as its CTO. The invoice was billable to Foley himself and directed the shipment to Automated.  It requested exactly 25 sets of parts and supplies that would be used to build and manufacture 25 arcade machines.[1]

---

[1] During the course of civil suit against FOLEY, GlobalVR discovered  that Phillip Foley (no relation to David Foley) had overseen the construction of 25 video game arcade cabinets at Daddona's facility.  These 25 arcade game cabinets contained Global VR intellectual property in the software and Global VR trademarked graphics on their exterior.  Phillip Foley had worked for

1    When Global VR executives confronted Foley with the information, FOLEY denied any

2  knowledge that any fob inventory was missing.  Global VR then called Daddona at Automated to

3  talk about the excess inventory.  Daddona eventually admitted during the telephone call that he

4  had entered into numerous "off the book transactions" with Foley, with checks payable to David

5  Foley, personally, so that David Foley could deposit them into his own personal bank accounts or

6  otherwise personally use those funds.  Foley's employment was subsequently terminated for

7  cause on September 23, 2006.

8    On October 11, 2006, Brian Matthews, a Global VR employee, happened upon a stash of

9  materials at Quality Expert Electronics ("QEE"), a building in San Jose where he and Foley had

10  been sharing space to build computers for exercise machines.  Foley's stash contained three

11  boxes filled with hundreds of fobs containing markings for game titles belonging to Global VR

12  and configured for UltraCade and Global VR multi-game systems.  Each of the game packs

13  found contained gaming software produced by Global VR under an exclusive license with the

14  game's owners, and Global VR owns rights in the proprietary software that enabled the games to

15  be played on Global VR arcade game platform.  The fobs at QEE were labeled internally the way

16  that Global VR labels its products, with stickers attached to the fobs themselves.  But, unlike

17  authentic Global VR products, and consequentially demonstrating its counterfeit nature, these

18  fobs did not contain a paper branding insert and product description that was usually placed

19  within the plastic wrapper.

20    After obtaining a temporary restraining order, several items belonging to GlobalVR were

21  seized from the work area at QEE assigned to Foley.  Of most significance, electronic files

22  containing sales art and labels of various game titles were discovered.  The files included artwork

23  used to for the exterior packaging of games for which Global VR had licenses, as well as for

24  games produced by other companies for which GlobalVR had no license to sell.[2]   Foley likely

25  ――――――――――――――

26  David FOLEY at UltraCade in the Boston, Massachusetts office.

27

28    [2] Later investigation showed FOLEY had packaged for sale popular games produced by
   other companies including Nintendo's Donkey Kong, after he successfully obtained a electronic

maintained the art work so that he could continue to illegally mass produce the game packs and make the products appear authentic with the counterfeited markings.

Eleven CD's were also found, which included the "Install Disks" for Global VR game packs that are used to load games licensed by GlobalVR onto the arcade systems before sale. Such as disk would have been necessary to load the gaming software onto the 25 arcade cabinet games Foley manufactured for Daddona. Other CDs contained Global VR's "Sales Art" files, allowing the holder to print labels to be used on products that would make those products appear to come from Global VR. During the course of the civil suit filed against Foley, he admitted that he secreted these materials at QEE on September 25th after being terminated for cause, presumably because he expected Global VR would come looking for them at his home.

Search Warrant

On January 30, 2008, two simultaneous search warrants were executed. During the search of Foley's residence, a fob burner, six hard drives with the operating system for Global VR arcade games, two game packs, and one key fob containing all 244 game files for the UltraCade gaming system were found and seized. During the search of Automated Services, over 2,000 counterfeit game packs were recovered. Of most significance were the recovery of electronic and paper invoicing show the sales of game packs by Daddona to third party customers. Through a combination of information obtained from the Automated Systems computers and admissions from Daddona himself, it is clear that subsequent to the June 2, 2006 date, (the date that all assets and intellectual property were fully transferred from UltraCade and Foley to the Sherwood Partners and then ultimately to GlobalVR), 3211 units of game packs were sold by Daddona. According to Daddona, all of the game packs were either purchased from Foley or created by Daddona using the fob burner purchased from Foley, subsequent to June 2, 2006.

Wire and Mail Fraud:

After learning of the materials found at QEE, Global VR sought emergency relief and

---

copy of the game code and formatted for use on the UltraCade gaming platform.

1   obtained a TRO requiring evidence preservation and cessation of manufacture of infringing

2   products, as well as a Writ of Possession for seizure of boxes from QEE, as well as hard drives

3   from Foley's residence.  These boxes contained documentary evidence – handwritten notes and

4   e-mails – reflecting correspondence between Foley and Daddona regarding Foley's scheme to

5   bootleg, manufacture, and "re-key" game packs and machines and sell them on the gray market.

6   The evidence confirmed that Foley had been "upgrading" key fobs for Daddona, stealing Global

7   VR's newest and best games, and loading them onto lower value fobs Daddona had not sold.

8           Analysis of the hard drives seized from Foley's residence revealed that he possessed

9   tens of thousands of electronic files related to each gaming title he was loading onto the fobs for

10  sale, including code for the Global VR games.  E-mails between Foley and Daddona were also

11  recovered from FOLEY's computer, outlining the history of the sales of counterfeit game packs

12  made by FOLEY and spreadsheets reflecting all of the payments FOLEY received from

13  Daddona.

14          After the Court issued the TRO and supplemental order, Daddona himself agreed to

15  produce evidence of his scheme with Foley. The documents provided by Daddona are incredibly

16  revealing. Daddona provided cancelled checks, signed and deposited by David Foley, totaling

17  over $350,000 between January and October 2006.  In an email dated September 21, 2006 (two

18  days before Foley was terminated), in exchange for "12 post dated checks for $6K each" made

19  out to Foley personally, which Foley claimed he needed to purchase a house, Foley offered to

20  provide Daddona "with any software and/or game packs that you want for any of the platforms

21  (including the pinball packs to be released in a couple of months) at the cost of the fobs, or free if

22  you provide the fobs."  Daddona also mailed Global VR samples of five of the bootlegged fobs

23  that Foley had made for him.  Like the other fobs in the three seized boxes, these five fobs

24  contained Global VR game packs as well as unlicensed games, all of which were configured to

25  run on Global VR systems and were packaged with Global VR logos to look like official Global

26  VR products.

27          From the documents that Daddona produced, it is also clear that Foley sent Daddona

28  bootleg "Taito" game packs before Global VR even released the product publicly.  To hide the

Government's Opposition To Compel Discovery

1    unauthorized nature of the prior shipments, Foley printed for Daddona, "insert cards for your

2    packs with the Global VR artwork, so that you have matching packs to what they will be

3    shipping."  In the same e-mail, Foley laid out the details of how he was building the unauthorized

4    game systems for Daddona, was burning Daddona sets of install discs, and would send Daddona

5    unauthorized I/O boards.

6            Moreover, all the evidence indicated that Foley was well aware that the counterfeit

7    products that he was sending to Daddona were indeed being mailed out to unsuspecting third

8    party customers who paid for the products through wire transfers.  For example, Foley's sending

9    to Daddona of  the Taito game packs were done even before Global VR had the opportunity to

10   publicly release and promote the product.  Also, Foley sold products to Daddona significantly

11   under the price that Global VR was offering, making his products more attractive to a retailer

12   such as Daddona.

13           Foley aided and abetted a vast system to defraud unwitting third party customers by

14   providing products to Daddona, knowing the products to be counterfeit and knowing that

15   Daddona would sell those products to consumers. As such, Daddona used the proceeds that he

16   received from these sales to consumers to purchase more fobs and game packs from Foley once

17   his inventory needed replenishing.  Also, to hide these illicit sales, Foley wrote to Daddona that,

18   for every machine that Daddona bought from Global VR, Foley and cohort Phil Foley will "build

19   you two or three so that Elaine [at Global VR] doesn't catch wind of your upgrades."  According

20   to Daddona, this is actually what he did.  Daddona, acting on the instructions of Foley, purchased

21   some products by Global VR, so that his sales of Global VR product would not seem completely

22   suspicious.

23           Foley's flooding of the coin-operated gaming industry with bootlegged goods has

24   driven demand for Global VR's products through the floor.  Global VR's reseller customers are

25   unwilling to buy from Global VR because of the cheap unlawful substitutes now available in the

26   market.  The last twelve months of off the book sales that Foley concealed reflect significant and

27   substantial losses to Global VR. Global VR estimates that Foley's conduct has cost it in excess of

28   $2 million.  Speaking only of sales alone, GlobalVR reported that Daddona legitimately only

purchased $93,000 worth of product from Global VR.  However, between January 2006 and January of 2008, Daddona sent $338,320.36 to Foley personally, often selling the counterfeit products at discounted prices.

Money Laundering:

The evidence indicates that Foley created a shell company called Toaplan through which he funneled the funds Daddona paid for the counterfeit game packs.  Daddona originally stated that he started sending Foley money through Toaplan sometime in 2006.  However, Daddona later clarified that because he only submitted an IRS form 1099 for Toaplan in the tax year 2007, he must have started sending money to Toaplan in 2007.  Foley told Daddona that the money sent to Toaplan had something to do with paying royalties to the person who originally invented the UltraCade product.  However, Daddona believed that the money sent to Toaplan was actually going to Foley.

Under Toaplan, Daddona sent 12 transfers of money, either through check or wiring, which eventually totaled $26,666.00. The table below indicates the dates and amounts of transfer.

| Type | Date | Amount | Total |
|---|---|---|---|
| Check | 1/29/2007 | $2,995 | |
| Check | 2/7/2007 | $6,000 | |
| Check | 8/1/2007 | $3,500 | |
| Check | 8/10/2007 | $2,700 | |
| Check | 8/15/2007 | $1,000 | |
| Check | 8/29/2007 | $2,000 | |
| Check | 9/4/2007 | $3,000 | |
| Check | 9/12/2007 | $2,371 | |
| Check | 9/12/2007 | $400 | |
| Check | 9/18/2007 | $1,000 | |
| Check | 9/26/2007 | $250 | |
| Check | 9/26/2007 | $1,450 | |
| | | | $26,666 |

Daddona's recollection that the majority of the business and transactions with Toaplan took place in 2007 appears to be verified by his submission of a 1099-Misc report, where he lists "Toaplan Co." as a recipient. However, he names Toaplan in "c/o David Foley" along with Foley's personal home address were listed as Toaplan's address.

Around this same time that Foley requested Daddona to transfer money to Toaplan,

Foley also asked Daddona to transfer money to an individual account which was under the name of Bruce Bean.  Bean , who is 83 years of age, has subsequently been located and interviewed. Bean stated that he did not recognize the transfer of money nor did he know the purpose or source of the deposits, but did say that Foley had free access to his bank account because Foley agreed to bury him when he dies.  (During the search warrant executed at FOLEY's residence, agents recovered Bean's driver's license, likely used by FOLEY to facilitate the laundering of money.) Foley told Daddona to send money to Bean because Bean was dying and needed the money.  Daddona did not believe Foley's story and thought the money was actually going to Foley.  Therefore, Daddona addressed another 1099 to Bruce Bean, care of David Foley.  In fact, funds that Daddona sent from his company, Automated Services, to Bean's account would be transferred to Foley's personal account almost immediately. The table below indicates the dates and flow of funds.

| Date | Amount from Daddona's Account to Bean's Account | Amount from Bean's Account to Foley's Account |
|---|---|---|
| 12/5/2006 | $10,000 | |
| 12/5/2006 | | $9,400 |
| 12/6/2006 | $10,000 | |
| 12/11/2006 | | $9,500 |
| 12/13/2006 | $5,000 | |
| 12/15/2006 | | $5,000 |
| 12/20/2006 | $5,000 | |
| 12/22/2006 | | $5,000 |
| 1/4/2007 | $5,000 | |
| 1/4/2007 | | $4,250 |
| 1/17/2007 | $5,000 | |
| 1/17/2007 | | $4,500 |
| 1/19/2007 | $4,000 | |
| 1/19/2007 | | $4,000 |
| 1/24/2007 | $4,000 | |
| 1/26/2007 | | $3,650 |
| 2/15/2007 | $3,000 | |
| 2/15/2007 | | $2,650 |
| 2/21/2007 | $3,000 | |
| 2/21/2007 | | $3,000 |
| 3/9/2007 | $3,000 | |
| 3/12/2007 | | $2,650 |
| 3/22/2007 | $3,000 | |
| 3/23/2007 | | $2,650 |
| 4/5/2007 | $2,000 | |
| 4/5/2007 | | $2,000 |

These records indicate that almost the total amount of the funds Daddona transferred

1  to Bean's account each time, was immediately transferred back to Foley.  Foley is a signatory to

2  Bean's account and appeared to have transferred the funds telephonically, often on the same day

3  the money was received from Daddona. .

4        Foley also admitted in a video deposition taken on January 17, 2007 for Global VR's

5  civil suit against Foley,  that Daddona did send him funds in exchange for game packs.  Foley

6  stated he received these checks in the mail, and further stated that he never provided that money

7  to Global VR, nor did he represent those sales as official sales for Global VR.  Rather, Foley

8  admits that he deposited those funds into his personal Bank of America account.

9                    <u>Money Laundering in Transactions Involving Property Derived From SUA</u>

10        During the time FOLEY manufactured and received payment from Daddona for the

11  counterfeit game packs, Foley maintained a large personal residence at 311 Santa Rosa Drive in

12  Los Gatos, which he had purchased for roughly three million.  The monthly mortgage payments

13  for the residence was approximately $10,700.  The table below indicates the dates and the

14  amount of monthly payments that Foley made on his mortgage to Countrywide Home Loans.

15

16
| Date | Type | Payor | Amount |
|------|------|-------|--------|
| December 14, 2006 | Mortgage Payment | David R. Foley | $10,714.19 |
| February 1, 2007 | Mortgage Payment | Toaplan Co Ltd | $11,249.90 |
| April 16, 2007 | Mortgage Payment | David R. Foley | $10,714.19 |
| May 16, 2007 | Mortgage Payment | David R. Foley | $16,874.85 |
| June 18, 2007 | Mortgage Payment | David R. Foley | $16,874.85 |
| July 23, 2007 | Mortgage Payment | David R. Foley | $16,874.85 |
| August 21, 2007 | Mortgage Payment | David R. Foley | $16,874.85 |
| August 28, 2007 | Mortgage Payment | David R. Foley | $16,874.85 |
| December 14, 2007 | Mortgage Payment | David R. Foley | $11,114.19 |
| January 22, 2008 | Mortgage Payment | David R. Foley | $18,067.87 |

22        Foley placed a substantial down payment to initially purchase the home on June 29,

23  2006. Foley submitted two personal checks for $95,668.93 and $35,463.47, totaling $131,132.40.

24  Between June 2, 2006, when the transfer of all intellectual property was completed, to June 29,

25  2006, when the checks he wrote for the deposit were submitted, records show Foley had received

26  substantial amounts of money from Daddona.  The table below indicates the dates, amount

27  transferred from Daddona to Foley, the means of transfer, what Daddona believed the payment to

28  be for, and the total sum.

| Date | Amount Transferred | Means of Transfer | Product | Total Sum |
|---|---|---|---|---|
| June 6, 2006 | $7,475.30 | Check | Cabinets | |
| June 13, 2006 | $7,475.30 | Check | Cabinets | |
| June 15, 2006 | $8,198.05 | Check | Packs | |
| June 19, 2006 | $8,198.05 | Check | Packs | |
| June 20,2006 | $7,475.30 | Check | Cabinets | |
| June 20, 2006 | $8,198.06 | Check | Packs | |
| | | | | $47,020.06 |

Theft of Trade Secrets:

Foley himself admitted to investigating agents that he physically removed items constituting trade secrets from the premises of GlobalVR. This physical transportation of Global VR products from the premises of Global VR with the intent to use it for his own benefit will be proven at trial. Moreover, the unauthorized duplication of Global VR products, which Foley allegedly completed through the use of the fob burner found in his home, substantially injured the owner of the trade secret, Global VR.

Bank Fraud:

As stated above, Foley applied for a bank loan when he purchased his new home in Los Gatos. Pursuant to the loan application submitted by Foley, Countrywide Home Loans provided FOLEY $2,624,475 , to be repaid at 8% interest over the course of 360 months. Foley co-signed the loan application with his wife, Lisa Foley, on October 3, 2006. This was roughly two weeks *after* Foley had been terminated for cause by Global VR on September 23, 2006.

Despite having been fired from the company, Foley knowingly misrepresented his employment status to Countrywide Home Loans, even though a clause of the contract, which is located directly above the signatures of David Foley and Lisa Foley, clearly indicated that it was a federal crime "to knowingly make any false statements." Foley indicated that he was then currently employed by Global VR, listing their San Jose address. He also indicated that he has been working on that job for five years and nine months, which is another fabrication as even the most conservative estimate (starting from the date of the "Memorandum of Understanding") does not have Foley working at Global VR for more than a year. He also lists his position as "CTO/EVP," again even though he was terminated from that post two weeks earlier.

Government's Opposition To Compel Discovery

13

1    Further review of the loan documentation submitted to Countrywide by Foley in

2  connection to the mortgage application revealed that Foley had additionally submitted a copy of a

3  promissory note purported to be from GlobalVR to Foley.  The note, which was a forgery,

4  obligated GlobalVR to pay Foley a total amount of $1 million in specified annual payments.  The

5  actual document from which it was created, obligated GlobalVR to pay the sum of $1.46 million,

6  but to "Nextune (Assignment for the Benefit of Creditors), LLC," not Foley.  Nextune was the

7  corporation used by Sherwood Partners in the ABC process, in which all of UltraCade's assets

8  were initially transferred.  It appears that Foley merely took a copy of the original document,

9  substituted his own name for Nextune, and changed the frequency of the payment to an annual

10  basis instead of a monthly payment.  Also, based on the document number at the bottom of the

11  promissory note that Foley submitted to Countrywide, Foley used an earlier version of the

12  document.  This version was not executed nor ever signed by James DeRose, CEO of Global VR.

13  The signature of DeRose on the copy that Foley submitted was forged.

14                                         **II**

15                         **STATEMENT OF THE CASE**

16    Foley and his co-defendant Daddona were indicted on July 1, 2009 for conspiracy to

17  commit mail and wire fraud, trafficking in counterfeit goods, trafficking in stolen goods, theft of

18  trade secrets, substantive counts of mail and wire fraud, conspiracy to commit money laundering,

19  and substantive counts of money laundering to conceal illegal activity, and money laundering

20  transactions in property derived from specified unlawful activity.

21    Foley made his initial appearance before Magistrate Trumbull on July 8, 2009 and

22  was subsequently released on a $100,000 personal appearance bond secured by the defendant's

23  own signature on that same date.  On July 27, Magistrate Trumbull issued an order appointing

24  the Federal Public Defender to represent Foley.  AFPD Lara Vinnard, later assisted by

25  Supervisory AFPD Nicholas Humy was assigned to represent defendant Foley. Since that time,

26  the Government provided over five thousand pages of discovery to defense counsel.  Over the

27  course of nearly a year, defendant Foley engaged in ten continued status conferences and

28  formally requested continuances of at least four appearances before the District Court.  No

Government's Opposition To Compel Discovery

motions were ever filed by defendant Foley during this year of reviewing discovery.

On June 10, 2010, Magistrate Trumbull allowed private counsel, Samuel Shepard by substituted in, indicating specifically that he was taking the case pro bono. Current counsel also specified that he would be acquiring full discovery from the Federal Public Defender as well as the information derived from the year long investigation done by that office.

The next day, and in light of the public documents filed with the Securities and Exchange Commission showing defendant Foley received income in excess of $400,000 per year from his current employer,  the United States requested this Court review defendant's Foley's financial status to determine what funds, if any, Foley should reimburse the Federal Public Defenders for their attorney and investigative services of over a year. This Court denied the request for repayment.

The defendant now brings a motion for discovery without any mention that over five thousand documents have already been produced by the United States, and without reference as to what documents that are in the possession of the United States that is missing.

### III

### POINTS AND AUTHORITIES

A.      DEFENDANT'S MOTION TO COMPEL DISCOVERY

        1.      The Government Already Has Or Will Disclose
            Information Subject To Disclosure Under
            Rule 16(a)(1)(A) Of The Federal Rules Of
            Criminal Procedure

The Government has produced discovery to defendant, including arrest reports disclosing the substance of all oral written and recorded statements of defendant.  The Government will continue to produce discovery related to defendant's statements made in response to questions by Government agents.

        2.      Defendant's Motion For Disclosure Of Oral
            Statements Made To Non-Government Witnesses
            Should Be Denied

Defendant is not entitled to discovery of oral statements made by him to persons who are not Government agents or are not acting on the Government's behalf.  The plain language of

Rule 16 and relevant case law supports this position.  Rule 16 unambiguously states that defendant is entitled to "written and recorded" statements made by him.  The rule limits discovery of oral statements to "that portion of any written record containing the substance of any relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent," and "the substance of any other relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known by the defendant to be a government agent if the government intends to use that statement at trial."  The statutory language clearly means that oral statements are discoverable only in very limited circumstances, and then, only when made to a known Government agent.

        3.        The Government Will Comply
                   With Rule 16(a)(1)(B

The Government will furnish to the defendant a copy of his rap sheet if any exists.  Any subsequent or prior similar acts of defendant that the Government intends to introduce under Rule 404(b) of the Federal Rules of Evidence will be provided at the time the Government's trial memorandum is filed.

        4.        The Government Will Comply
                   With Rule 16(a)(1)(C)

The Government will permit defendant to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are material to the preparation of the defendant's defense or are intended for use by the Government as evidence in its case-in-chief at trial or were obtained from or belong to defendant.  Defendant may view the seized evidence at a mutually convenient time.

        5.        The Government Will Comply
                   With Rule 16(a)(1)(D)

The Government will permit defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession of the Government, and by the exercise of due diligence may become known to the attorney for the Government, and are material to the preparation of the

defense or are intended for use by the Government as evidence in its case-in-chief.

6.      The Government Will Comply With Its
        Obligations Under Brady v. Maryland

The Government is well aware of and will fully perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment. Defendant, however, is not entitled to all evidence known or believed to exist which is, or may be, favorable to the accused, or which pertains to the credibility of the Government's case.  As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

> [T]he prosecution does not have a constitutional duty to
> disclose every bit of information that might affect the
> jury's decision; it need only disclose information
> favorable to the defense that meets the appropriate
> standard of materiality.

611 F.2d at 774-775 (citations omitted).  See also United States v. Sukumolachan, 610 F.2d 685, 687 (9th Cir. 1980)  (the Government is not required to create exculpatory material that does not exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976)  (Brady does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure).

7.      The Government Objects To The Full
        Production Of Agent's Handwritten
        Notes At This Time

Although the Government has no objection to the preservation of agents' handwritten notes, it objects to defendant's requests to the extent that they require full production for immediate examination and inspection.  If certain rough notes become relevant during any evidentiary proceeding, those notes will be made available.

Prior production of these notes is not necessary because they are not "statements" within the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness' assertions and they have been approved or adopted by the witness.  United States v. Spencer, 618 F.2d 605, 606-607 (9th Cir. 1980); see also United States v. Griffin, 659 F.2d 932, 936-38 (9th Cir. 1981), cert. denied, 456 U.S. 949 (1982).

//

Government's Opposition To Compel Discovery

1

8.      <u>Discovery Regarding Government Witnesses</u>

2

Defendant requests certain discovery regarding Government witnesses.  The Ninth

3

Circuit discussed the proper scope of discovery regarding prospective Government witnesses in

4

<u>United States v. Jones</u>, 612 F.2d 453 (9th Cir. 1979), <u>cert. denied</u>, 445

5

U.S. 966 (1980), stating:

6

The trial court correctly ruled that the defense had no right to pretrial discovery of
information regarding informants and prospective government witnesses under Federal

7

Rules of Criminal Procedure, the Jencks Act, 18 U.S.C. § 3500, or <u>Brady v. Maryland</u>,
373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  Federal Rules of Criminal Procedure

8

16(a)(2) and (a)(3) exclude both "statements made by government witnesses or
prospective government witnesses, except as provided in 18 U.S.C. § 3500 [Jencks Act]"

9

and grand jury transcripts from the category of evidence the defense is entitled to discover
before trial.  This limitation has also been extended to prohibit the pretrial disclosure of

10

the identity of government witnesses in the absence of a showing of reasonable necessity
by the defense.

11

<u>Id</u>. at 454-455.

12

13

The Government therefore is not required to provide defendant with a list of the

14

names and addresses of the witnesses it  expects to call at trial.  <u>United States v. Thompson</u>, 493

15

F.2d 305, 309 (9th Cir.), <u>cert. denied</u>, 419 U.S. 834 (1974); <u>United States v. Glass</u>, 421 F.2d 832,

16

833 (9th Cir. 1969).  In addition, agreements with witnesses need not be turned over prior to the

17

testimony of the witness.  <u>United State v. Rinn</u>, 586 F.2d 113, 119 (9th Cir. 1978), <u>cert. denied</u>,

18

441 U.S. 931 (1979).  Similarly, there is no obligation to turn over the criminal records of all

19

witnesses.  <u>United States v. Taylor</u>, 542 F.2d 1023, 1026 (8th Cir. 1976), <u>cert. denied</u>, 429 U.S.

20

1074 (1977).

21

The Government voluntarily will provide a tentative witness list along with the record

22

of felony convictions and any criminal convictions that relate to false statements or perjury of

23

prospective Government witnesses at the time the Government's trial memorandum is filed.  The

24

Government will not provide the addresses of prospective Government witnesses.  Evidence of

25

juvenile adjudications generally are not admissible (Federal Rules of Evidence 609(d)) therefore

26

will not be revealed voluntarily to defendant.  If any such adjudications are found, the

27

Government will reveal such information to the Court for an <u>in camera</u> determination of their

28

admissibility.

Government's Opposition To Compel Discovery

The production of witness statements is governed by the Jencks Act (Title 18, United States Code, Section 3500) and need occur only after the witness testifies on direct examination. United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986), cert.denied, 479 U.S. 1094 (1987); United States v. Mills, 641 F.2d 785, 790 (9th Cir.), cert denied, 454 U.S. 902 (1981). Indeed, even material believed to be exculpatory and therefore subject to disclosure under the Brady doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under the Act. See United States v. Bernard, 623 F.2d 551, 556-57 (9th Cir. 1979).

The Government reserves the right to withhold the statements of any particular witnesses it deems necessary until after they testify. Otherwise, the Government will disclose the statements of witnesses no later than five days prior to trial, provided that defense counsel has complied with their obligations under Federal Rules of Criminal Procedure 12.1, 12.2, 16 and 16.2, and provided that defense counsel will turn over all "reverse Jencks" statements at that time. Additionally, the Government will disclose the terms of any agreements by Government agents, employees or attorneys with witnesses that testify at trial. Such information will be provided five days prior to trial.

Defendant also asks the Government for any evidence revealing prior criminal acts attributable to the witnesses. The Government asks that this request be denied. Rule 608(b) permits use of prior acts of misconduct only when they relate to untruthfulness. The Government will disclose such evidence only if it reasonably relates to untruthfulness.

9.   Consideration Or Promise Of Consideration
      To Government Witnesses

The Government will comply with its obligations to disclose impeachment evidence under Giglio v. United States, 405 U.S. 150 (1972). The Government will comply with its obligations to disclose impeachment material, if any, when it fails its trial memorandum, although it is not required to produce such material until after its witnesses have testified at trial or at a hearing. See United States v. Bernard, 623 F.2d 551, 556 (9th Cir. 1979).

Government's Opposition To Compel Discovery

1      10.     Prior Wrongful Conduct of Government Witnesses

2          The Government will provide the criminal history and prior material acts of

3   misconduct, if any, of its trial witnesses as mandated by Giglio v. United States, supra, 405 U.S.

4   150.  The Government will provide such impeachment material, if any, at the time it files its trial

5   memorandum.

6      11.     Motives of Government Witnesses

7          The Government agrees to provide information related to the bias, prejudice or other

8   motivation of Government trial witnesses as mandated in Napue v. Illinois, 360 U.S. 264 (1959).

9   The Government will provide such impeachment material, if any, at the time it files its trial

10  memorandum.

11     12.     Investigation of Government Witnesses

12         The Government is not aware that any potential witness is under investigation.

13     13.     Defendant's Motion For The Disclosure Of Witness
               Information Should Be Denied Except As Is Agreed
14             To By The Government

15         Defendant seeks numerous records and information pertaining to potential

16  Government witnesses.  Regarding these individuals, the Government will provide defendant

17  with the following items prior to their trial testimony:

18             (a)     The terms of all agreements (or any other inducements) it has made

19  with cooperating witnesses;

20             (b)     All relevant exculpatory evidence concerning the credibility or bias of

21  Government witnesses as mandated by law; and,

22             (c)     Any record of prior criminal convictions that could be used to impeach

23  a Government witness.

24         The Government opposes disclosure of rap sheet information of any Government

25  witness prior to trial because of the prohibition contained in the Jencks Act.  See United States v.

26  Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976), cert.denied, 429 U.S. 1074 (1977).  Furthermore,

27  any uncharged prior misconduct attributable to Government witnesses, all promises made to and

28  consideration given to witnesses by the Government, and all threats of prosecution made to

Government's Opposition To Compel Discovery

witnesses by the Government, will be disclosed if required by the doctrine of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 450 U.S. 150 (1972).  The Government will not agree to provide information which "arguably could be helpful or useful to the defense" because it does not meet the Brady standard.

      14.    Defendant Is Not Entitled To Pretrial
             Discovery Of Grand Jury Information

To the extent the grand jury transcripts sought by defendant consist of statements of Government witnesses, otherwise subject to the Jencks Act (18 U.S.C. § 3500), disclosure may not be required except under the terms of that Act.  Thus, pretrial discovery of such transcripts must be denied, and the only access available to defendant is after the witness has been called by the United States and has testified on direct examination.

In United States v. Daras, 462 F.2d 1361 (9th Cir.), cert. denied, 409 U.S. 1046 (1972), defendants were convicted of possession of cocaine with intent to distribute.  On appeal, they assailed the failure of the district court to allow them access to the grand jury testimony.  In a per curiam opinion, the Ninth Circuit summarily disposed of that contention, stating:

> It was not error to refuse the appellants access to the grand jury transcript. . . .
> The transcript, as to witnesses other than the defendants, is covered by the Jencks Act, 18 U.S.C. § 3500, and it is not available until the grand jury witness has completed his trial testimony.  Here, the grand jury witness was not one called or to be called at trial.

462 F.2d at 1362.  The same view was expressed in United States v. Hearst, 412 F.Supp. 863, 869 (N.D. Cal. 1975), as well as in a number of other decisions at the appellate level.  See, e.g., United States v. Campagnuolo, 592 F.2d 852, 858-61 (5th Cir. 1979); United States v. Tager, 481 F.2d 97, 100 (10th Cir. 1973), cert. denied, 415 U.S. 914 (1974); United States v. Quintana, 457 F.2d 874, 878 (10th Cir.), cert. denied, 409 U.S. 877 (1972).

The conclusion that the Jencks Act is controlling with respect to disclosure of Government witnesses' testimony before the grand jury is consistent with the purposes and scope of Rule 6(e) of the Federal Rules of Criminal Procedure.  In Fund for Constitutional Government v. National Archives & Records Service, 656 F.2d 856, 868 (D.C. Cir. 1981), the court stated that the "legislative history and cases construing [Rule 6(e)] indicate that it was intended to preserve the traditional rule of grand jury secrecy with certain limited exceptions."  Further, the

1   court in United States v. Weinstein, 511 F.2d 622, 627 (2d Cir.), cert. denied, 422 U.S. 1042

2   (1975), stated that the Rule "was not designed as an authorization for pretrial discovery."

3   Accordingly, the exception in Rule 6(e)(3)(C) allowing disclosure of grand jury matters on court

4   order "in connection with a judicial proceeding" must give way to the Jencks Act unless the

5   defendant can show "a particularized need" that outweighs the policy of grand jury secrecy.

6   United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986); United States v. Murray, 751 F.2d

7   1528, 1533 (9th Cir.), cert denied, 474 U.S. 979 (1985).  The Government need not make a

8   showing of a possible threat to the lives of the grand jury witnesses in order to maintain the need

9   for secrecy.  United States v. Wellington, 754 F.2d 1457, 1469 (9th Cir.), cert. denied, 474 U.S.

10  1032 (1985).

11          Furthermore, even if the examination of the transcript reveals Brady material, the

12  transcript is still not discoverable prior to trial.  When the defense seeks material that is both

13  Jencks Act and Brady material, the Jencks Act controls.  United State v. Jones, 612 F.2d 453,

14  455 (9th Cir. 1979), cert. denied, 445 U.S. 966 (1980).

15          Here, the defendant has offered no "particularized need" to justify disclosure of the

16  grand jury transcript before the testimony of a grand jury witness at trial.  Defendant's motion

17  should be denied.

18          15.     Ability to Perceive; Any Drug or Alcohol
                    Use By Government Witness

19
20          The Government is not aware of any evidence that any Government witness' ability to

21  perceive is impaired or that any Government witness has ever used narcotics or other controlled

    substance or is an alcoholic.

22
            16.     Defendant's Motion For
23                  Examination Of Personnel Files

24          Defendant requests personnel files for Government agents, presumably under the

25  theory that they may contain Brady material.  the Brady rule does not require the prosecutor to

26  deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused

27  that, if suppressed, would deny him a fair trial.  United States v. Bagley, 473 U.S. 667, 675

28  (1985).

Government's Opposition To Compel Discovery

While the prosecution must disclose any information within the possession or control of law enforcement personnel, it has no duty to volunteer information that it does not possess or of which it is unaware.  United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 824 (9th Cir. 1985), cert. denied, 471 U.S. 1139 (1985); see also United States v. Gatto, 763 F.2d 1040, 1048-49 (9th Cir. 1985).  Furthermore, in those instances in which the requested personnel files are in the possession or control of the prosecution, the prosecutor only has a duty to disclose exculpatory information.  United States v. Cadet, 727 F.2d 1453, 1467 (9th cir. 1984).

The Government will conduct a review of the personnel files of its agents whom the Government intends to call as witnesses at trial.  Further, pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) and Cadet, the United States agrees to "disclose information favorable to the defense that meets the appropriate standard of materiality." Cadet, 727 F.2d at 1467-68 (quoting United States v. Gardner, 611 F.2d 770, 774-75 (9th Cir. 1980)).  If counsel for the United States is uncertain about the materiality of the information within it's possession, the material will be submitted to the Court for an in camera inspection and review.

17.    Other Discovery Requests

To the extent that the above does not answer all of the discovery requests, the Government opposes all other motions on the grounds that there is no authority requiring the Government to provide the material.

B.    ANY LEAVE FOR DEFENDANT TO FILE FURTHER
      MOTIONS SHOULD BE STRICTLY LIMITED

While the Government recognizes this court's discretion to permit defendant to file further motions, the Government does oppose defendant's motion to the extent it is conjectural, overly broad and invites abuse.  Any need for further motions should be justified at the time they are filed, permitting both the Government to oppose on a motion-by-motion basis and this court to determine if such motions could in fact have been filed earlier.  Any other course would invite an interminable and protracted motion practice, resulting in delay of trial.

//

//

Government's Opposition To Compel Discovery

C.   THE GOVERNMENT'S MOTION FOR RECIPROCAL
     DISCOVERY SHOULD BE GRANTED

1.   Rule 16(b)

The defendant has invoked Federal Rule of Criminal Procedure 16(a) in his motion for discovery.  In addition, the Government voluntarily will comply with the requirements of Federal Rule of Criminal Procedure 16(a).  Thus, the 16(b) provision of that rule are operable as to defendant.

The Government, pursuant to Rule 16(b), hereby requests the defendant to permit the Government to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which are within the possession, custody or control of defendant and which he intends to introduce as evidence in his case in chief at trial.

The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of the defendant, which he intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call as a witness.  The Government also requests that the Court make such orders as it deems necessary under Rule 16(d)(1) and (2) to ensure that the Government receives the discovery to which it is entitled.

2.   Rule 26.2

Federal Rule of Criminal Procedure 26.2 requires the production of prior statements of all witnesses except the defendant.  The Rule thus provides for the reciprocal production of Jencks statements.  As stated in pertinent part:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney . . . to produce, for the examination and use of the moving party, any statement of the witness that is in their possession . . . .

Fed. R. Crim. P. 26.2(a).

Government's Opposition To Compel Discovery

1    The time frame established by the Rule requires the statement to be provided after the

2    witness has testified, as in the Jencks Act.  Therefore, the Government hereby requests that

3    defendant be ordered to supply all prior statements of defense witnesses by a reasonable date

4    before trial to be set by the court.  This order should include any form these statements are

5    memorialized in including, but not limited to, tape recordings, handwritten or typed notes and

6    reports.

7                                          IV

8                                    <u>CONCLUSION</u>

9    Defendant's motions should be denied, except where unopposed, and the

10   Government's motion for reciprocal discovery should be granted.

11

     DATED:   October 27, 2010

12
                                         Respectfully submitted,
13
                                         MELINDA HAAG
14                                       United States Attorney

15                                              /S/

16                                       RICHARD C. CHENG
                                         Assistant United States Attorney
17

18

19

20

21

22

23

24

25

26

27

28

Government's Opposition To Compel Discovery